**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

PENN, LLC, d/b/a PULSETV.COM,

*Plaintiff*,

-against-

FREESTYLE SOLUTIONS INC., f/k/a
DYDACOMP DEVELOPMENT CORP., INC.,

*Defendant.*

Civil Action No.____2:22-cv-6760_____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Penn, LLC ("Penn"), d/b/a PulseTV.com ("Plaintiff" or "PulseTV"), by and through its attorneys, Tarter Krinsky & Drogin LLP, alleges as follows:

**INTRODUCTION**

1.      Plaintiff PulseTV, an online retailer, seeks money damages for substantial injuries it sustained as the result of a catastrophic data breach (the "Data Breach") on the systems of Defendant Freestyle Solutions Inc., f/k/a Dydacomp Development Corp., Inc. ("Defendant" or "Freestyle").

2.      Freestyle provides, *inter alia*, inventory, order, and customer management software and other e-commerce and hosting services for hundreds of interactive online stores. As a central component of its operations, Freestyle comes into the possession of – and is entrusted with – confidential financial information, including cardholder data for millions of consumers. In this regard, Freestyle holds itself out to its customers and the public as having particular skills and knowledge in the field of safeguarding such confidential financial information in a hosted environment.

3.      As an entity that stores, processes, and transmits cardholder data, as a key part of its business operations, Freestyle's computer network must comply with the Payment Card

2

Industry Data Security Standard ("PCI DSS"), which are technical and operational requirements set by the PCI Security Standards Counsel ("PCI SSC") to protect cardholder data. Prior to the Data Breach, Freestyle made numerous affirmative misrepresentations concerning the security of its cloud hosting services, compliance with the PCI DSS and the measures that it purportedly had in place to protect confidential financial information from unauthorized disclosure. In short, Freestyle lied about the safety of critical customer information stored on its systems.

4.      Contrary to Freestyle's repeated contentions, its cloud-based management services platform was not PCI-compliant. Freestyle knew that. As a direct and proximate result of Freestyle's non-compliance, on or before September 18, 2020, unknown and unauthorized third parties hacked Freestyle's computer network and used malware to gain access to highly  sensitive information of an undetermined number of PulseTV's consumers. Upon information and belief, the Data Breach compromised the credit and/or debit number(s), expiration date(s), internal bank codes, personal identifying information and/or other confidential financial information (collectively, "Sensitive Financial Information") of tens of thousands of PulseTV's customers.

5.      The Sensitive Financial Information that was compromised by the Data Breach includes data provided by consumers who used the e-commerce websites that Freestyle hosted for Plaintiff and numerous other online retailers. Freestyle has claimed that it did not learn of the Data Breach until it was contacted by Plaintiff. As a direct and proximate result of the Data Breach, Plaintiff was forced to give notice to more than 200,000 customers, who subscribed to PulseTV's email distribution lists, that their Sensitive Financial Information may have been disclosed. Given the magnitude of the Data Breach, the costs and repercussions associated with doing so were substantial, and include, *inter alia*, the mass unenrollment of customers from Plaintiff's email distribution lists, a near fifty-percent decrease in forecasted revenue, time spent by Plaintiff's

3

employees and third parties to address the breach, and unprecedented harm to PulseTV's reputation and goodwill. Further, there have been several reported incidents of fraud and misuse of the Sensitive Financial Information of customers that was disclosed by the Data Breach.

6.     Plaintiff's primary business is email subscription driven and relies on PulseTV maintaining long-term relationships with repeat customers. Plaintiff brings this lawsuit for the purpose of recovering, *inter alia*, (i) costs and expenses associated with investigation and remediation of the Freestyle Data Breach, (ii) costs, expenses, and other financial repercussions associated with notifying their customers, (iii) consequential damages including customer acquisition costs, decreased sales volume, lost profits, lost advertising revenue, dramatic loss in email subscribers, the costs of unsold goods, lost business opportunities, permanent damage to Plaintiff's reputation and goodwill, among other injuries sustained by Plaintiff as a direct and proximate result of Freestyle's failure to exercise reasonable care to prevent the Data Breach and (iv) all other damages and losses incurred as the direct and proximate result of Freestyle's failure to comply with the PCI DSS, which allowed the Data Breach.

7.     Freestyle's conduct, as alleged herein, violates the New Jersey Consumer Fraud Act ("the "NJCFA"), N.J.S.A 56:8-1 et. seq., together with various other common law causes of action. In addition, Freestyle's failure to timely and accurately notify consumers immediately following its discovery of the data breach in 2021 violates the federal Fair Credit Reporting Act, 15 U.S.C. § 1681b, and New Jersey's Data Breach Notification Statute, N.J.S.A. 56:8-163.

## PARTIES

8.      Penn is, and at all relevant times was, a Delaware limited liability company with its principal place of business located at 7851 185th St., Suite 106, Tinley Park, IL 60477.

9.      Upon information and belief, Freestyle is, and at all relevant times was, a Delaware corporation with a principal  place of business located in Parsippany, New Jersey. As discussed below, the Sensitive Financial Information of PulseTV's customers was compromised as a direct result of Freestyle's noncompliance with the PCI DSS, which caused the Data Breach.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, as this suit arises under federal laws that create causes of action in favor of Plaintiff and against Defendant.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, based on diversity of citizenship.

12.     This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendant Freestyle because it conducts substantial business within this state and throughout the United States.

14.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the acts giving rise to Plaintiff's claims occurred in this district and because Defendant conducts substantial business in this judicial district.

## FACTUAL BACKGROUND

### A.     Penn, LLC, d/b/a PulseTV.com

15.     PulseTV, founded in 1996, is an independently owned business-to-consumer e-commerce company.

16.     PulseTV utilizes a single e-commerce webapp server running IIS hosting the PulseTV e-commerce site, PulseTV.com.

17.     PulseTV.com is running Freestyle's shopping cart technology, SiteLINK.

18.     Freestyle is solely responsible for hosting and managing PulseTV's e-commerce infrastructure.

**B.      Freestyle's Management Software and Other Services.**

19.     PulseTV and Freestyle have been working together, under multiple versions of Freestyle's standard form services agreements, for more than twenty years. PulseTV originally contracted with Freestyle, to host its website payment card operations based on certain representations made by Freestyle regarding its secure hosting services.

20.     Freestyle describes itself as an industry leader in providing cloud-based order, inventory and customer management solutions that integrate easily with e-commerce platforms to drive efficiency and growth "while not sacrificing PCI compliance or other industry standards."

21.     Freestyle (then Dydacomp) launched its first e-commerce option, called SiteLINK Toolkit, back in the early 2000s. PulseTV was a customer of SiteLINK Toolkit, which PulseTV hosted directly in its offices starting in and around March of 2001. SiteLINK Toolkit included, *inter alia*, payment processing services related to bank card and credit card transactions.

**C.      The Payment Card Industry Data Security Standard**

22.     As payment fraud began to rise, in 2004, credit card industry leaders convened to develop a common set of security standards. Their intention was to create an additional level of protection for card issuers by ensuring that merchants meet minimum levels of security when they store, process, and transmit cardholder data. The combined effort  made by the principal credit

card organizations resulted in the release of version 1.0 of the Payment Card Industry Data Security Standard (a/k/a, the PCI DSS) in December 2004.

23.     The PCI DSS are technical and operational requirements that apply to all organizations that store, process, or transmit cardholder data – with guidance for software developers and manufacturers of applications and devices used in those transactions.

24.     Thereafter, in or about 2005, Freestyle told PulseTV that it would no longer support the SiteLINK Toolkit outside of Freestyle's own hosting environment and that, if PulseTV wanted to continue to use SiteLINK, it needed to move its e-commerce store onto Freestyle's web servers.

25.     Upon information and belief, the reason that Freestyle insisted that PulseTV migrate its e-commerce store to Freestyle's hosting environment was to increase Freestyle's gross revenue by creating additional income streams.

26.     To convince PulseTV to transition its e-commerce store to Freestyle's hosting environment, Freestyle's President, and other Freestyle employees, made affirmative misrepresentations to PulseTV, and its former employee and agent, Thomas Fannernon, Senior Solutions Specialist, regarding the safety and security of Freestyle's computer networks and its ability to comply with the PCI DSS.

27.     For example, Freestyle's President, falsely stated to PulseTV that Freestyle had a plan to become PCI DSS compliant in 2005. Freestyle's current President, Jim Cahill, later noted that Freestyle had retained a PCI Compliance Officer.

28.     Upon information and belief, at all relevant times, Freestyle's statements regarding its data security protocols and PCI DSS compliance were known to be false and made with the intent to induce PulseTV to enter into new agreements .

29.     Between 2005 and 2012, Freestyle made numerous misrepresentations to PulseTV

that SiteLINK and Freestyle's hosting environment were safe, secure, and PCI DSS compliant.

30.     Contrary to Freestyle's statements and the statements of its employees, Freestyle's computer networks, software, and hosting services did not comply with the PCI DSS.

31.     Freestyle knew or should have known that its statements, which were made to induce PulseTV to allow Freestyle to take over hosting of Freestyle's e-commerce store, were false.

32.     In reliance upon Freestyle's affirmative misrepresentations regarding its data security protocols and PCI DSS compliance, which statements were known to be false at the time they were made, PulseTV agreed to migrate its e-commerce store to Freestyle's web servers.

33.     In reliance upon Freestyle's affirmative misrepresentations regarding its data security protocols and PCI DSS compliance, which statements were known to be false at time they were made, PulseTV entered into additional agreements with Freestyle to provide hosting and e-commerce administration services.

**D.     The Managed Services Agreements.**

34.     Between 2004 to 2018, PulseTV entered into several iterations of Freestyle's standard form service contract, which each contained variations of Freestyle's standard form terms and conditions.  In most instances, the execution copy of the invoice or agreement did not include a copy of the applicable terms and conditions, which terms and conditions were incorporated by reference with a link to access the terms and conditions from Freestyle's website.

35.     On or about March 21, 2012, PulseTV and Freestyle (then Dydacomp) executed a SiteLINK Software License and Online Store Service Agreement. A copy of the SiteLINK Software License and Online Store Service Agreement, dated March 21, 2012, is attached hereto as **Exhibit A**.

36.     At or around the time of the 2012 agreement, Freestyle represented to PulseTV that Freestyle had a plan to maintain PCI compliance.

37.     Freestyle repeatedly reassured PulseTV that its systems were PCI compliant including via, *inter alia*, webinars touting Freestyle's security protocols and PCI DSS compliance, in addition to asserting PCI DSS compliance on their website following the breach.

38.     Freestyle's false representations regarding its PCI compliance were frequent, including at business functions that took place in different states.

39.     On or about August 15, 2018, Anisa Ali ("Anisa") of PulseTV executed an invoice for services from Freestyle that incorporated by reference the new terms and conditions that governed the services provided by Freestyle. Copies of the executed invoice, dated August 15, 2018, and Freestyle's then-current terms and conditions that were incorporated therein by reference, are attached hereto as **Exhibit B**.

40.     At all relevant times, Freestyle reserved the right to amend, supplement, or terminate the agreements unilaterally by mere notice of publication of a revised agreement.

41.     At all relevant times, PulseTV lacked a meaningful opportunity to negotiate changes or revisions to the terms and conditions that governed the parties' relationship.

42.     At all relevant times, Freestyle sought to impose terms and conditions in the agreements that would limit Freestyle's liability in the event of a data breach that was caused by Freestyle's negligence.

43.     The managed services agreements that were entered between Freestyle and Pulse are contracts of adhesion because Freestyle reserved the right to change the contract terms unilaterally and on notice.

44.     Freestyle fraudulently induced PulseTV into the agreements for services that failed

to provide the critical level of security that Freestyle promised and that PulseTV expected at the time it entered the agreements.

45.     The Freestyle contract does not mention PCI compliance. Accordingly, Freestyle's representations regarding PCI compliance are collateral to the contract.

46.     At all relevant times, the statements by Freestyle regarding PCI compliance were made with knowledge that they were false with the intent to induce PulseTV to enter additional agreements with Freestyle.

**E.**     **Freestyle's Recent Representations Regarding PCI and Security Compliance.**

47.     At present, Freestyle's website describes the "Cloud hosting" service it provides as "the modern solution for companies that need mobility, 24/7 access to their services, PCI compliance and added security." A copy of Dydacomp's PCI Position Statement from 2014 is attached hereto as **Exhibit C**.

48.     Freestyle's website further represents:

> Cloud-based website hosting is the ideal option for those looking for a more secure and efficient solution to their software hosting and server setup. With Freestyle Solutions' cloud hosting services for M.O.M., you won't have to worry about infrastructure, maintenance or support for your inventory management system or order management software. **Of course, PCI-compliant hosting is a must for serious eCommerce companies**.

(Emphasis added).

49.     In direct reliance on these and other material representations, PulseTV agreed to engage Freestyle to provide cloud hosting services. PulseTV reasonably relied on Freestyle's assurances, webinars, and updates that they were PCI compliant.

50.     At all relevant times, Freestyle knew or should have known that it was not PCI compliant.

**F.**      **The Malware and 2020 Freestyle Data Breach**

51.      During the initial months of this year, PulseTV became aware of a critical security issue with Freestyle Solutions' system, which enabled a malware attack on a webserver hosted and maintained exclusively by Freestyle.

52.      In particular, PulseTV received an email notice from its affiliate, Titanium, in March of 2021, of a potential CPP (Common Point of Purchase) and responded with all of their requested information. At that time, no evidence of compromise was discovered.

53.      It was the beginning of October 2021, when PulseTV received notice of additional CPPs, that PulseTV decided to hire forensic investigators to pursue a further investigation.  At that time, notice of the holdback reserve was implemented.

54.      Ultimately, PulseTV hired multiple  3rd party forensic companies to conduct a detailed review and investigation of the potential breach. First, PulseTV hired Sylint, an internationally recognized cyber security and digital data forensics firm, to investigate the Data Breach. Sylint was unable to determine the issue due to Freestyle's poor management of their own systems. As a result, Several Credit Card Brands demanded PulseTV hire a second company to assist in investigating the Data Breach, resulting in extra, unnecessary costs to both PulseTV's staff and its insurance carrier.

55.      When PulseTV contacted Jim Cahill of Freestyle to report the potential breach, Freestyle claimed it was completely unaware of the malware attack. It was shocking to hear that PulseTV was the first to provide notice to Freestyle of the occurrence, given that the malware had been present and operating inside Freestyle's computer network for more than twelve months.

**G.**    **Events Leading up to The Disclosure of the Breach.**

56.    Following the malware attack on Freestyle's webserver, PulseTV learned for the first time that Freestyle's representations regarding PCI-compliance were entirely false.

57.    Freestyle's web services were demonstrably <u>not</u> PCI-compliant, despite being touted as such, and as an integral feature of its services to be provided to PulseTV.

58.    It was PulseTV—and not Freestyle—that engaged forensic cybersecurity experts to investigate the source of unauthorized charges on its customers' card data.

59.    That investigation spanned the course of several months, during which Freestyle was less than forthcoming, and which ultimately revealed that the source of the breach existed in areas of Freestyle's system that were completely inaccessible to PulseTV.

60.    The Final PCI Report indicates certain suspicious activity in September 2020.

61.    PulseTV's forensic investigators reviewed the IIS logs and identified that certain malicious software, Cobalt Strike Beacon, was created on the Freestyle Solutions managed web server on August 27, 2020.

62.    PulseTV asked Freestyle to implement multi-factor authentication in August 2021 and Freestyle took certain containment action regarding suspicious software in January 2022.

63.    PulseTV repeatedly requested that Freestyle provide copies of backups for the server in order to assess the damage done by the threat actors, but Freestyle gave a plethora of excuses, including a purported  third party "malfunction," before admitting that they did not have any backups to provide despite the requirement under the PCI DSS that Freestyle retain backups for at least twelve months.

64.    Freestyle's inability – or unwillingness – to assist PulseTV has precluded PulseTV from completing its PFI, a necessary and critical step for PulseTV to begin to mitigate its damages.

65.    Despite professing to be compliant with the PCI standards at all relevant times, it has since been determined that Freestyle was non-compliant with certain PCI DSS standards, including properly creating and retaining backups and file integrity monitoring.

**H.    The Aftermath of the Data Breach.**

66.    As detailed above, Freestyle fraudulently induced PulseTV into an agreement for services that failed to provide the critical level of security that Freestyle promised and that PulseTV expected.

67.    Despite Freestyle's awareness of its critical security failures, Freestyle has failed to enact appropriate remedial measures to safeguard its webserver since the discovery of the breach.

68.    After being made aware of the Data Breach, Freestyle continued touting on their website that they were PCI compliant knowing that they were not.

69.    On information and belief, based on information provided by Secret Service Agent Cody Majerus, data from the Data Breach was located on the dark web. This means that the Sensitive Financial Information, including personal identifying information ("PII"), of PulseTV's customers was and remains available for sale to bad actors for nefarious and illegal purposes.

**I.    The Independent Report by a PCI Forensic Investigator**

70.    Because Freestyle did not create and retain backups, credit card companies forced Freestyle to hire a PCI Forensic Investigator ("PFI") to investigate the breach and create a report concerning the breach.

71.    On or around January 11, 2022, PulseTV engaged Kroll, a global company certified as a PFI by the PCI SSC, to conduct a PFI in response to the notification from the United States Secret Service (USSS) and a Visa Common Point of Purchase (CPP) report suggesting potential payment card related fraud originating in PulseTV's ecommerce infrastructure.  As part of the

engagement, PulseTV provided Kroll with evidence including CPP data, forensic images of a SQL Server and a web server hosting PulseTV's website, a backup of the Multi-order Management ("MOM") database, backups of web page related files, database transaction logs, and several other files.

72.     Kroll's investigation determined that the Freestyle hosted web server associated with PulseTV was compromised with IIStealer malware as early as September 9, 2020.  The IIStealer malware modified existing files and created new files in the Windows folder on the web server.

73.     While reviewing the forensic image of the web server, Kroll determined that at the time of the incident there was no evidence of any change-detection mechanism to alert personnel to unauthorized modification of files on the system, as per PCI DSS Requirement 11.5.  According to Kroll, in order to be PCI compliant, any change detection mechanism would have had to been deployed on the server prior to the incident on September 9, 2020, and if a properly configured change detection mechanism had been deployed, it would have alerted Freestyle personnel to the introduction of the IIStealer malware.  A copy of Kroll's PFI Report dated May 19, 2022, is attached hereto as **Exhibit D**.

**J.     The Impact of the Freestyle Data Breach on Plaintiff**

74.     Out of an abundance of caution and in accordance with applicable laws, PulseTV began notifying various state Attorneys General and its customers of the Data Breach in and around December of 2021.

75.     Notwithstanding the extraordinary acceleration of gross sales volumes in the year 2020 and the first quarter of 2021, PulseTV has already experienced a near 50% decrease in  gross sales volumes as a direct result of the Data Breach.

76.     Immediately after PulseTV started to send notifications to its customers regarding the Data Breach, its sales volumes began to drop dramatically, as PulseTV began to lose buyers, as countless customers unsubscribed from PulseTV's email distribution lists.  Each time that PulseTV sent a new round of notices to its customers, it experienced a near immediate loss in email subscriptions and further decreases in sales.

77.     Freestyle's lack of urgency in responding to this security issue has directly caused PulseTV to suffer continuing damages, as well as precluded PulseTV from mitigating its damages. The longer this issue goes unresolved, the more damages PulseTV is sure to incur.

78.     As a direct and proximate result of Freestyle's repeated and blatant failures, PulseTV has already incurred substantial damages of a continuing nature.

79.     PulseTV's damages include, but are by no means limited to, the following: (1) costs associated with investigation, notification, and regulatory responses to the breach, which increase every day; (2) loss of business revenues; (3) cash flow restrictions due to withholdings; (4) reputational harm; (5) loss of goodwill; (6) potential liability from class action lawsuits; (7) potential regulatory fines; and (8) potential Payment Card Industry fines arising from the ongoing PFI investigation.

80.     PulseTV is still in the early stages of evaluating the total amount of damages it has and will continue to incur due solely to Freestyle's failures.

81.     However, PulseTV has already experienced a 50% decrease in sales, and is experiencing ongoing daily withholdings of $195,415.00.

82.     Prior to the Freestyle breach, Penn, LLC, d/b/a PulseTV.com, had 42 straight quarters (over 10 years) of profitability averaging over $700,000 of profit per quarter.

83.     Because Freestyle's failures compromised the payment card information of over 236,000 of PulseTV's customers, PulseTV now faces liability for claims by each and every one of those customers, in addition to the damages it has already suffered for the loss of business. For this reason, PulseTV is entitled to indemnification and contribution for its losses.

84.     PulseTV expects that its total losses are likely to exceed $30,000,000.00.

85.     PulseTV has always prided itself on customer loyalty and has geared its services towards an older audience. In fact, PulseTV built a customer service department around being able to help this particular audience. Unfortunately, this is the demographic that is troubled by breaches and thousands of VIP customers unsubscribed from its email subscription list once PulseTV sent its notices of the Data Breach out to its customers.

86.     95% of PulseTV's e-commerce sales are generated by sending emails to the people on its email distribution list. It took over 20 years and tens of millions of dollars to build that distribution list. The money and effort it took to build the goodwill, branding, and familiarity PulseTV had with its email recipients is almost incalculable.

87.     PulseTV estimates that, as a result of the Data Breach, 55,439 typical buyers have unsubscribed from Plaintiff's email distribution list. The average lifetime value of each typical buyer is calculated to be approximately $165. Accordingly, as a result of the Data Breach, PulseTV has suffered a future loss in the approximate amount of $9,147,435.

88.     In addition, PulseTV estimates that 11,055 VIP buyers have unsubscribed from Plaintiff's email distribution list. The average lifetime value of each VIP buyer is estimated to be approximately $370.19. Accordingly, as a result of the Data Breach, PulseTV has suffered a future loss in the approximate amount of $4,092,450.45.

89.     Accordingly, PulseTV's total lost future revenue, not counting labor hours, is estimated to be approximately $13,469,885.45.

90.     In addition, PulseTV has suffered a loss of advertisement revenue. Due to the notifications PulseTV was forced to send out because of the Freestyle breach, PulseTV has had a mass "unsubscribe." The mass unsubscribe has resulted in anticipated lost ad revenue of approximately $902 per week or $117,360.88 over the next five years.

91.     In addition, as a result of the notice of claim submitted by Plaintiff to their insurance carrier, the carrier has refused to renew and canceled PulseTV's insurance policy.

92.     On top of this, PulseTV is now carrying excess inventory that cannot be monetized. Relationships with key vendors have been severely damaged.  PulseTV's cost of goods has risen substantially, and it has been forced to pass on closeout opportunities because of quantity and cash flow issues.

93.     PulseTV was also forced to terminate certain employees because of reduced sales, both in the office and their warehouse.

94.     Due to the nature of the damages, PulseTV has suffered and continues to suffer irreparable injury.

## AS AND FOR A FIRST CAUSE OF ACTION
(Declaratory Judgment)

95.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 94.

96.     As a result of the acts described in the preceding paragraphs, there exists a justiciable controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

97.     A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its rights regarding the contracts with Freestyle.

98.     Accordingly, Plaintiff is entitled to a declaratory judgment that the consequential damages waiver and limitation of liability provisions in the contracts are, inter alia, unconscionable, commercially unreasonable, and/or procedure by fraud and, thus, they are null and void and of no force and effect.

99.     As a result, Plaintiff is entitled to seek and recover such damages, including consequential, compensatory, and punitive, as is appropriate and necessary to put Plaintiff in as good a position as they would have been but for Freestyle's wrongful acts, negligence, and failure to safeguard the Sensitive Financial Information of Plaintiff's customers.

## AS AND FOR A SECOND CAUSE OF ACTION
(Negligence/Gross Negligence)

100.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 99.

101.     Defendant, upon coming into possession of the private, non-public, and financial information of the customers of Plaintiff, had a duty to exercise reasonable care in safeguarding and protecting such information from being compromised and/or stolen. This duty arises from the common law, as well as from those duties expressly imposed upon Defendant from sources such as contracts between Defendant, agreements between Defendant and other third parties, and industry standards (such as the Payment Card Industry Data Security Standard ("PCI DSS") a set of security controls mandated by the major credit card companies).

102.     Defendant also had a duty to timely disclose the fact that the customers of Plaintiff non-public financial information within its possession had been, or was reasonably believed to have been, compromised. Instead, it has shifted this obligation to provide direct, individualized notice of the breach to affected consumers to Plaintiff.

103.    Defendant also had a duty to have procedures in place to detect and prevent dissemination of Plaintiff's private information to third parties. This breach of security and unauthorized access was reasonably foreseeable to Freestyle.

104.    Defendant, through its acts and/or omissions, unlawfully breached their duty to Plaintiff by, *inter alia*, failing to exercise reasonable care in protecting and safeguarding the Sensitive Financial Information within its possession, and by failing to timely inform Plaintiff that non-public financial information relating to its customers had been compromised.

105.    Defendant, through its actions and/or omissions, breached their duty to Plaintiff by failing to have adequate procedures in place to detect and prevent dissemination of Plaintiff's private information to third parties.

106.    But for Freestyle's intentional and negligent breach of its duties owed to Plaintiff, the Sensitive Financial Information of consumers would not have been compromised, and Plaintiff would not have suffered the catastrophic loss of business and customers, as well as costs associated with, *inter alia*, notifying their customers and card holders of the Data Breach.

107.    Freestyle's acts and omissions, which demonstrate utter disregard for the consequences which may ensure from the act, and indifference to the rights of Plaintiff and others, constitutes gross negligence. Freestyle failed to exercise even slight care or slight diligence in implementing appropriate security protocols to safeguard the Sensitive Financial Information.

108.    The injuries suffered by Plaintiff were a reasonably foreseeable consequence of Freestyle's negligence.

## AS AND FOR A THIRD CAUSE OF ACTION
(Breach of Contract)

109.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108.

110.    Plaintiff entered into contracts with Defendant that impose minimum standards that Freestyle must meet with respect to the security and non-disclosure of consumer's Sensitive Financial Information.

111.    The contracts require that Freestyle take appropriate steps to safeguard the Sensitive Financial Information of the customers of Plaintiff.

112.    Upon information and belief, Freestyle has saved (or avoided spending) a substantial sum of money by not complying with its contractual obligations. Instead, many additional costs have been incurred by Plaintiff as a result.

113.    Freestyle breached these agreements by, *inter alia*, failing to adequately safeguard the Sensitive Financial Information. This has directed caused injuries to Plaintiff.

**AS AND FOR A FOURTH CAUSE OF ACTION**
(Breach of Implied Contract)

114.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 113.

115.    The customers of Plaintiff were required to provide Freestyle with their Sensitive Financial Information in order for Freestyle to provide its services on their behalf. Implicit in this transaction was a covenant for Freestyle to, inter alia, take reasonable efforts to safeguard this information, and to take appropriate measures to promptly notify consumers in the event that this information was compromised. Indeed, Freestyle recognizes these obligations, as it states on its website that the company is "deeply committed to maintaining the security of cardholder data, and we will continue doing everything reasonably possible to achieve this objective." This covenant also ran to Plaintiff.

116.    This implied contract required Defendant to not disclose the private, nonpublic Sensitive Financial Information of the customers of Plaintiff, and to safeguard and protect the information from being compromised and/or stolen.

117.    Defendant did not safeguard and protect this private, nonpublic, and financial information from being compromised and/or stolen. To the contrary, Freestyle allowed this information to be disclosed to an unauthorized third party or parties.

118.    Because Freestyle disclosed this Sensitive Financial Information, did not inform the customers of Plaintiff of the breach in a timely manner, and failed to safeguard and protect this information from being compromised and/or stolen (as it implied it would through its representations about the level of security it would provide), Freestyle breached its implied contract with Plaintiff.

119.    Plaintiff has and/or can be expected to incur actual damages as a result.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Negligence Per Se)

120.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 119.

121.    Freestyle is and—during all relevant times—has been required to comply with the PCI Standards, which required it to have, inter alia, adequate controls in place for preventing, detecting, and responding to system intrusions.

122.    These regulations and industry security standards establish the minimal duty of care owed by the Freestyle to the Plaintiff.

123.    Freestyle failed to meet that minimum duty. Indeed, an independent and thorough investigation and audit revealed that, at the time of the Data Breach, Freestyle was not PCI compliant.

124.    Freestyle's violations of these regulations and industry security standards caused injury to Plaintiff.

125.    The injuries suffered by Plaintiff were of the type intended to be prevented by these regulations and industry security standards.

126.    Plaintiff is a member of the class of persons intended to be protected by these regulations and industry security standards.

127.    Freestyle's negligence per se is a proximate cause of the injuries inuring to Plaintiff.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Negligent Misrepresentation/Fraudulent Inducement)

128.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 127.

129.    Freestyle intentionally, recklessly, and/or negligently made false representations of present material fact to Plaintiff concerning Freestyle's security systems, PCI-compliance, the measures it was taking to protect the Sensitive Financial Information that was compromised, and other topics that were outside the express terms and conditions of the parties' contracts. Freestyle knew of should have known that these statements were false.

130.    Freestyle's statements were made with intent that Plaintiff would rely on those statements and enter or continue the Parties' contracts. Plaintiff reasonably relied upon Freestyle's misrepresentations and false statements.

131.    As a direct and proximate result of Plaintiff's reliance on Freestyle's statements, Plaintiff has suffered an ascertainable loss or injury in an amount to be determined at trial, but not less than $30,000,00, together with costs, disbursements and attorneys' fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Violation of NJCFA, N.J.S.A 56:8-1 et. seq.)

132.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 127.

133.    Plaintiff is a member of the class of  "consumers" within the meaning of the NJCFA.

134.    At all times material hereto, Freestyle conducted trade and commerce throughout the United States, using its offices in New Jersey as the base of its operations.

135.    The NJCFA is, by its terms, a cumulative remedy, such that remedies under its provision can be awarded in addition to those provided under separate statutory schemes.

136.    Freestyle's conduct alleged above, includes but is not limited to: (i) failing to adhere to data security standards; (ii) failing to safeguard card information; (iii) expressly or impliedly misrepresenting that it complied with applicable data security standards; and/or concealing that its data security measures were deficient, constituting violations of N.J.S.A. 56:8-1 et. seq.

137.    The foregoing acts, misrepresentations, omissions, and unconscionable commercial practices caused Plaintiff to suffer an ascertainable loss and other damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(Per Set Violation of NJCFA, N.J.S.A 56:8-1 et. seq.)

138.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 137.

139.    A violation of N.J.S.A. 56:8-161-165 is an unlawful practice under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-166.

140.    Freestyle's security breach constitutes a "breach of security" within the meaning of N.J.S.A. 56:8-161.

141.    Defendant is a "business" within the meaning of N.J.S.A. 56:8-161.

142.    Plaintiff is a member of the class of "individuals" and "customers" within the meaning of N.J.S.A. 56:8-161.

143.    Freestyle's breach of security included the personal information of Plaintiff and their customers.

144.    Freestyle violated N.J.S.A. 56:8-163 as follows:

    a.    Defendant failed to properly disclose its breach of security to Plaintiff.

      b.   Defendant knew or should have known of the breach as early as September 2020, yet failed to publicize the breach in any way until confronted by Plaintiff in January and February of this year; and

      c.   Defendant knew or should have known that the personal information that was the subject of the breach was likely to be and in fact was being – misused.

145.    Freestyle's violation of N.J.S.A. 56:8-163 as alleged herein is per se unlawful under the New Jersey Consumer Fraud Act.

146.    The foregoing acts, misrepresentations, omissions, and unconscionable commercial practices caused Plaintiff to suffer an ascertainable loss and other damages.

## AS AND FOR A NINTH CAUSE OF ACTION
(Fair Credit Reporting Act ("FCRA"))

147.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 146.

148.    The Fair Credit Reporting Act ("FCRA") imposes the following duty: "Every consumer reporting agency shall maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under [15 U.S.C. § 1681b]." 15 U.S.C. § 1681e(a). Section 1681b sets forth various permissible purposes for the furnishing of consumer reports. Allowing consumer reports to be accessed by a computer hacker does not comply with any permissible purpose set forth in Section 1681b.

149.    The FCRA defines "consumer reporting agency" as follows:

The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis added).

150.    The FCRA defines "consumer report" as follows:

> The term "consumer report" means any written, oral, or other
> communication of any information by a consumer reporting agency
> bearing on a consumer's credit worthiness, credit standing, **credit
> capacity**, character, general reputation, personal characteristics, or
> mode of living which is used or expected to be used or collected in
> whole or in part for the purpose of serving as a factor in establishing
> the consumer's eligibility for
>
> > (A) **credit** or insurance to be used primarily for personal,
> > family, or household, purposes;
> >
> > (B) employment purposes; or
> >
> > (C) any other purpose authorized under [15 U.S.C. § 1681b].

15 U.S.C. § 1681a(d)(1) (emphasis added).

151.    Freestyle is a "consumer reporting agency" as defined by the FCRA. Freestyle

assembles credit and debit card information and furnishes it to numerous third-parties, including

Visa, MasterCard, and card-issuing banks.

152.    Credit and debit card information constitutes a "consumer report" as defined by the

FCRA. Card information is used at the point of sale to determine cardholders' credit capacity -i.e.,

their eligibility to purchase goods or services.

153.    Plaintiff is part of the class of "consumers" as defined and construed under the

FCRA, 15 U.S.C. § 1681a(c).

154.    Freestyle received fees for assembling and furnishing consumer information.

155.    The FCRA also requires: "any person that maintains or otherwise possesses

consumer information . . . derived from consumer reports for a business purpose to properly

dispose of any such information or compilation." 15 U.S.C. § 1681w(a)(1). In connection with this

rule, several disposal provisions are codified at 16 C.F.R. §§ 682.1 to 682.5. Those provisions state

the following, in relevant part:

25

    a.    "Any person who maintains or otherwise possesses consumer information for a business purpose must properly dispose of such information by taking reasonable measures to protect against unauthorized access to or use of the information in connection with its disposal." 16 C.F.R. § 682.3(a).

    b.    The term "dispose" is defined to include the "transfer of any medium, including computer equipment, upon which consumer information is stored." 16 C.F.R. § 682.1(c)(2).

    c.    The term "consumer information" is defined to include "any record about an individual, whether in paper, electronic, or other form, that is a consumer report or is derived from a consumer report." 16 C.F.R. § 682.1(b).

156.    Defendant's processing of card transactions met the definition of "disposal" because Defendant transferred cardholder data.

157.    The credit and debit card information that Defendant processed was consumer information for purposes of the disposal rule.

158.    Defendant failed to comply with the disposal rule because Defendant did not take reasonable measures to protect against unauthorized access.

159.    Defendant willfully or recklessly failed to comply with the FCRA. Defendant knew or recklessly disregarded that its data security was inadequate when processing Plaintiff's card transactions.

160.    Defendant willfully or recklessly failed to properly: (i) monitor for unauthorized access to cardholder information; and/or (ii) adopt procedures to prevent or detect unauthorized access to cardholder information.

161.    The FCRA states the following with respect to damages:

    (a)    Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

        (1)(A)  any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000

26

(B)    such amount of punitive damages as the court may allow; and

(C)    in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

162.    Plaintiff has been damaged by Defendant's inadequate data security. Plaintiff is entitled to actual or statutory damages of not less than $100, and not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

163.    The FCRA also imposes liability for negligent as opposed to willful violations. The FCRA states:

(a)    Any person who is negligent in failing to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1)    any actual damages sustained by the consumer as a result of the failure; and

(2)    in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681o(a).

164.    To the extent Defendant is found to have negligently failed to comply with the FCRA, Plaintiff is entitled to actual damages, as well as litigation costs and attorney's fees.

### <u>AS AND FOR A TENTH CAUSE OF ACTION</u>
(New Jersey Truth-In-Consumer Contract,
Warranty and Notice Act ["NJTCNA"])

165.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 164.

166.    Plaintiff is a member of the class of "consumers" within the meaning of N.J.S.A. 56:12-15.

167.     The Truth-In-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-15 states, in relevant part:

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

168.     Freestyle is a bailee as defined by the NJTCNA, charged with the secure handling of the personal financial information of Plaintiff.

169.     Defendant was obligated by state law to disclose its security breach and the compromise of Plaintiff's personal financial information in the most expedient time possible and without unreasonable delay, pursuant to N.J.S.A. 56:8-163. Defendant was notified of the breach as early as September 2020 and did not disclose it until around February 2022.

170.     The disclosure requirements of N.J.S.A. 56:8-163 are a clearly established responsibility of Defendant and/or the legal right of Plaintiff, which was violated by Defendant and gave rise to the NJTCNA violation, N.J.S.A. 56:12-15.

171.     Defendant further violated the NJTCNA by violating the NJCFA, N.J.S.A. 56:8-2 et seq. in at least the following three ways: (i) committing a per se violation by failing to adhere to the disclosure requirements of N.J.S.A. 56:8-163; (ii) by giving or displaying a written consumer notice which affirmatively misrepresents facts material to the breach and the compromised personal financial information of Plaintiff; and/or (iii) knowingly omitting facts material to the breach and the compromised personal financial information of Plaintiff.

172.    Defendant has a responsibility to provide, and Plaintiff has an established right to be informed by, a written notice where the material facts are neither misrepresented nor omitted. The prior notices issued by Freestyle fail to comply with this requirement.

173.    Defendant has knowingly suppressed the most material of facts: the identity of merchants and/or consumers whose personal financial information was, in fact, compromised. Defendant knowingly omitted this information. Instead, they shifted the burden to consumers by instructing them to be reactive by reviewing monthly statements, rather than Defendants establishing protective measures for the personal financial information of Plaintiff.

174.    By concealing the full extent of potential fraudulent transactions while issuing its notices and other statements within the notice, Freestyle violated the NJCFA by misleading consumers as to the security of their personal financial information.

175.    Defendant violated the NJTCNA as set forth herein and is therefore liable to Plaintiff for a minimum statutory penalty of $100.00, as well as actual damages and attorneys' fees and costs, for any one of these violations pursuant to N.J.S.A. 56:12-17.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Punitive Damages)

176.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 175.

177.    Freestyle's wrongful acts as described in the preceding paragraphs were intentional, malicious, and made for the purpose of injuring Plaintiff, and with willful and conscious disregard of Plaintiff's rights.

178.    Freestyle's wrongful acts in failing to safeguard consumers' Sensitive Financial Information and subsequently failing to disclose the existence and extent of the Data Breach pose a risk to the public at large that warrants the imposition of exemplary and/or punitive damages.

179.    Accordingly, Plaintiff is entitled to exemplary and/or punitive damages in an amount to be determined at trial, but no less than $1,000,000.

## AS AND FOR A TWELFTH CAUSE OF ACTION
(Indemnification and Contribution)

180.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 179.

181.    Because Freestyle's failures are the sole, direct and proximate cause of PulseTV's damages, PulseTV is entitled to indemnification and to be held harmless for any and all losses that are the direct and proximate result of Freestyle's improper acts.

182.     Freestyle's failures to implement, monitor, and maintain its web servers in the manner that it promised was the direct and proximate cause of Plaintiff's losses as set forth herein.

183.    Plaintiff and Class members are entitled to indemnification and contribution.

**WHEREFORE**, Plaintiff, Plaintiff Penn, LLC, d/b/a PulseTV.com, on behalf of itself and those similarly situated, demand judgment against Defendant, Freestyle Solutions Inc., as follows:

(a)    On the First Cause of Action, a judgment declaring: the consequential damages waiver and limitation of liability provisions in the contracts are, inter alia, unconscionable, commercially unreasonable and procured by fraud and, thus, the consequential damages waiver and limitation of liability provisions in the contracts are null and void and of no force and effect;

(b)    On the Second Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(c)    On the Third Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(d)    On the Fourth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(e)    On the Fifth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(f)     On the Sixth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(g)     On the Seventh Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(h)     On the Eighth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(i)     On the Ninth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(j)     On the Tenth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(k)     On the Eleventh Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above;

(l)     On the Twelfth Cause of Action, a money judgment against Defendant in an amount to be determined and such other and further relief as is set forth above; and

(m)     Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
        November 23, 2022

                        **TARTER KRINSKY & DROGIN LLP**
                        *Attorneys for Plaintiff Penn, LLC, d/b/a*
                        *PulseTV.com*

                        By: _____
                                Richard C. Schoenstein (*pro hac pending*)
                                Richard J.L. Lomuscio
                                Aasheesh V. Shravah (*pro hac pending*)
                                Matthew R. Torsiello
                        1350 Broadway, 11th Floor
                        New York, New York 10018
                        Tel: (212) 216-8000

Fax: (212) 216-8001
Email: rschoenstein@tarterkrinsky.com
Email: ashravah@tarterkrinsky.com
Email: rlomuscio@tarterkrinsky.com
Email: mtorsiello@tarterkrinsky.com